1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  AILEEN BROOKS, *on behalf of herself and all others similarly situated*, | No.  1:21-cv-01341-DAD-BAK |
| 12 | |
| 13         Plaintiff, | ORDER DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND |
| 14      v. | MOTION FOR SANCTIONS |
| 15  IT WORKS MARKETING, INC., et al., | (Doc. Nos. 14, 20, 32, 34, 35) |
| 16         Defendants. | |
| 17 | |

18          This matter is before the court on a motion to compel arbitration and a motion for

19  sanctions filed on behalf of defendants It Works Marketing, Inc., It Works! Global, Inc. (together,

20  "It Works!"), Mark Pentecost, and Paul Nassif (collectively, "defendants") on October 27, 2021

21  and May 19, 2022, respectively.  (Doc. Nos. 14, 32, 34.)  The court took these motions under

22  submission to be decided on the papers, without holding a hearing.  (Doc. Nos. 15, 33.)  For the

23  reasons explained below, the court will deny defendants' pending motion to compel arbitration

24  and motion for sanctions.

25                              **BACKGROUND**

26          Plaintiff Aileen Brooks, a Bakersfield resident, proceeds on her first amended class action

27  complaint ("FAC") against defendants, asserting violations of several California consumer

28  protection statutes.  (Doc. No. 17.)  In her FAC, plaintiff alleges that defendants have defrauded

1

1    the public by marketing, distributing, and selling a suite of unapproved weight control drugs,

2    which are allegedly promoted with fraudulent efficacy claims, and that defendants also allegedly

3    bill unsuspecting consumers through unlawful auto-billing practices.  (*Id.* at ¶¶ 3–4, 19, 24.)

4    Plaintiff purchased one of the defendants' products—Thermofight X$^x$ ("Thermofight")—"from an

5    independent distributor using the It Works website."  (*Id.* at ¶ 77.)

6           On October 27, 2021, defendants filed the pending motion to compel arbitration based on

7    an arbitration provision contained in the It Works! Website Terms of Use ("Terms of Use") that

8    plaintiff purportedly agreed to when making her Thermofight purchase.  (Doc. Nos. 14; 14-5 at 2,

9    6–8.)  Defendants maintain that the Terms of Use were posted on the It Works! website and

10    clearly linked at the bottom of each webpage.  (Doc. No. 14 at 7.)  Defendants also contend that

11    when plaintiff purchased Thermofight "she would have been required to click an agreement to be

12    bound by all terms and conditions of the website."  (*Id.* at 5.)  Specifically, in making her

13    purchase of Thermofight, defendants contend that plaintiff signed up to become a "Loyal

14    Customer," and before completing any purchase as a "Loyal Customer," defendants maintain that

15    plaintiff would have been required to "submit an electronic acknowledgment and agreement to

16    'all terms and conditions' of the website," which appears on the website as follows:

(Doc. Nos. 14 at 7; 14-6 at 2.)  Defendants contend that because plaintiff would "have had to affirmatively agree to '*all* terms and conditions' governing the It Works website . . . by checking a box" and providing an "electronic acknowledgement," plaintiff agreed to arbitrate her dispute with defendants.  (Doc. No. 14 at 7–8, 11–12) (emphasis added).  In other words, defendants argue that by completing the checkout process, plaintiff not only agreed to the It Works! Loyal Customer Agreement Terms & Conditions ("Loyal Customer Agreement") (pictured above in scroll box), but she also agreed to the Terms of Use (not pictured above) linked at the bottom of each webpage.  Although defendants provided a copy of the Terms of Use in support of their pending motion (*see* Doc. No. 14-5), they did not provide the court with a copy of the Loyal Customer Agreement or a copy of the version of the Loyal Customer Agreement that plaintiff purportedly electronically acknowledged and signed.  Instead, defendants only provided an image (shown above) displaying a small portion of the Loyal Customer Agreement.

On November 23, 2021, plaintiff filed her opposition to defendants pending motion to compel arbitration.  (Doc. No. 18.)  In a declaration filed in support of that opposition, plaintiff declared under oath that she never saw the hyperlink to the Terms of Use, or read the Terms of Use, or even used the website when making her initial Thermofight purchase:

> When purchasing Thermofight, I never viewed the document titled "It Works Website Terms of Use."
>
> When purchasing Thermofight, I never saw the link to Defendants' "Terms of Use."
>
> In making my initial Thermofight purchase, I did not view Defendants' website at all.
>
> I made my Thermofight purchase through an It Works "independent distributor," who created my account and enrolled me in automatic billing.

(Doc. No. 18-1 at ¶¶ 2–5.)  Because plaintiff contends her purchase was made through an independent distributor using the website, she argues that she could not have agreed to the Terms of Use, and thus did not agree to arbitrate her dispute.  (Doc. No. 18 at 5.)  Moreover, plaintiff contends that defendants are misleading the court "by conflating two different documents, a three page 'Loyal Customer Agreement' that contains no mention or reference to arbitration, and a

hidden website 'Terms of Use' document that is seven pages and contains an arbitration clause." (*Id.*)  As plaintiff argues in her opposition brief, the "Terms & Conditions" that a consumer must affirmatively assent to in order to execute a purchase as a Loyal Customer do not include the "Terms of Use" that defendants have relied on as the basis for their pending motion to compel arbitration.  (*Id.* at 6–7.)  Rather, the "Terms & Conditions" refer only to the Loyal Customer Agreement—not to the Terms of Use—and the Loyal Customer Agreement itself does not mention arbitration at all.  (*Id.*)  In support of plaintiff's opposition, her counsel has also filed a declaration with attached exhibits showing screenshots from the It Works! website that document what a website user would see when making a purchase as a Loyal Customer.  (*See* Doc. No. 18-2.)

On November 30, 2021, defendants filed their reply in support of their pending motion. (Doc. No. 19.)  Therein, defendants argue that because plaintiff checked a box on the image above stating, "I agree to all terms and conditions" and because users "must agree to all terms in order to proceed," it is "clear and unambiguous" that "all" includes defendants' Terms of Use in addition to the Loyal Customer Agreement.  (*Id.* at 3–4.)  Defendants also contend that plaintiff's declaration filed in support of her opposition brief is a "sham" that the court should disregard because it contradicts the allegations of her original complaint and the FAC.  (*Id.* at 3–6.)  In the alternative to the court concluding that plaintiff's declaration is a sham, defendants request that the court allow discovery into plaintiff's visits to and use of the It Works! website before ruling on the pending motion to compel arbitration.  (*Id.* at 9.)

Defendants' allegations regarding the veracity of plaintiff's declaration have generated a heated dispute between the parties.  On December 15, 2021, plaintiff filed an *ex parte* motion seeking leave to file a sur-reply in opposition to defendants' pending motion.  (Doc. No. 20.) Therein, plaintiff seeks to respond to defendants' allegation that plaintiff's declaration contradicts the allegations of the original complaint and the FAC and therefore should be disregarded as a "sham."  (*Id.*)  Defendants' opposed plaintiff's *ex parte* motion seeking to file a sur-reply.  (Doc. No. 21.)

/////

4

Then, on May 19, 2022, defendants filed a motion for sanctions against plaintiff and her counsel under Rule 11 seeking reasonable attorneys' fees and costs in the amount of $283,857.77.[1]  (Doc. No. 34 at 6–7.)  Defendants argue that plaintiff's declaration filed in opposition to the pending motion to compel reveals that "this case's core factual premises—that Plaintiff was supposedly misled by the advertising and terms on the It Works! website—is undisputedly false."  (*Id.* at 6.)  In response, on May 23, 2022, plaintiff filed an *ex parte* motion to strike defendants' motion for sanctions, or in the alternative, to continue the motion and require that defendants' produce billing records.  (Doc. No. 35.)  The court issued a minute order granting plaintiff an extension of time in which to file her brief in opposition to plaintiff's motion for sanctions because plaintiff's counsel was commencing a civil jury trial on or around the time her opposition brief was due.  (Doc. No. 36.)

Because the court can resolve defendants' pending motion to compel arbitration without adjudicating the disagreement regarding plaintiff's declaration, plaintiff's *ex parte* motion for leave to file a sur-reply and defendants' request for discovery regarding plaintiff's visits to the It Works! website will both be denied as moot.  Moreover, having reviewed defendants' motion for sanctions, the court concludes that it can be resolved without the need for plaintiff to file an opposition brief.

## APPLICABLE LEGAL STANDARDS

### A.  Federal Arbitration Act

A written provision in any contract evidencing a transaction involving commerce to settle a dispute by arbitration is subject to the Federal Arbitration Act ("FAA").  9 U.S.C. § 2.  The FAA confers on the parties involved the right to obtain an order directing that arbitration proceed in the manner provided for in a contract between them.  9 U.S.C. § 4.  The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall

---

[1]  Aside from the pending motions and *ex parte* filings described herein, plaintiff also filed a motion for a preliminary injunction on December 21, 2021.  (Doc. No. 22.)  Defendants filed an opposition to plaintiff's motion for a preliminary injunction on January 18, 2022.  (Doc. No. 29.) Plaintiff filed her reply thereto on January 25, 2022.  (Doc. No. 30.)  The court will address plaintiff's pending motion for a preliminary injunction in a subsequent order.

1    direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been

2    signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).  In deciding a motion to

3    compel arbitration, the court "is limited to determining (1) whether a valid agreement to arbitrate

4    exists [within the contract] and, if it does, (2) whether the agreement encompasses the dispute at

5    issue." *Boardman v. Pac. Seafood Group*, 822 F.3d 1011, 1017 (9th Cir. 2016) (citing *Chiron

6    Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000) (brackets in original)).

7            However, before a court can reach those two questions, it "must decide whether there is an

8    agreement to which the federal law of arbitrability could apply." *Galilea, LLC v. AGCS Marine

9    Ins. Co.*, 879 F.3d 1052, 1056 (9th Cir. 2018).  "As the Supreme Court has recognized, a court

10   should order arbitration only if it is convinced an agreement has been formed." *Ahlstrom v. DHI

11   Mortg. Co., Ltd., L.P.*, 21 F.4th 631, 635 (9th Cir. 2021); *see also Int'l Bhd. of Teamsters v. NASA

12   Servs., Inc.*, 957 F.3d 1038, 1041–42 (9th Cir. 2020).  Thus, courts "must first make a threshold

13   finding that the document [evidencing an agreement] at least purports to be . . . a contract."

14   *Galilea*, 879 F.3d at 1056 (quoting *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469,

15   476 (9th Cir. 1991)).

16   **B.**      **Rule 11 Sanctions**

17           Under Rule 11 of the Federal Rules of Civil Procedure, an attorney presenting a pleading,

18   written motion, or other paper to the court certifies that to the best of their "knowledge,

19   information, and belief, formed after an inquiry reasonable under the circumstances:"  (1) "it is

20   not being presented for any improper purpose, such as to harass, cause unnecessary delay, or

21   needlessly increase the cost of litigation"; (2) "the claims, defenses, and other legal contentions

22   are warranted by existing law or by a nonfrivolous argument for extending, modifying, or

23   reversing existing law or for establishing new law"; and (3) "the factual contentions have

24   evidentiary support or, if specifically so identified, will likely have evidentiary support after a

25   reasonable opportunity for further investigation or discovery."  Fed. R. Civ. P. 11(b)(1)–(3).

26   When the court determines that Rule 11(b) has been violated, it "may impose an appropriate

27   sanction on any attorney, law firm, or party that violated the rule or is responsible for the

28   violation."  Fed. R. Civ. P. 11(c)(1).

"Rule 11 is an extraordinary remedy, one to be exercised with extreme caution." *In re Keegan Management Co., Securities Litigation*, 78 F.3d 431, 437 (9th Cir. 1996) (quoting *Operating Engineers Pension Trust v. A-C Co.*, 859 F.2d 1336, 1345 (9th Cir. 1988)). "[T]he central purpose of Rule 11 is to deter baseless filings in district court and . . . streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). When a court examines a complaint for frivolousness under Rule 11, it must determine both (1) whether the complaint is legally or factually baseless from an objective perspective, and (2) whether the attorney conducted a reasonable and competent inquiry before signing it. *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005). A nonfrivolous complaint cannot be filed for an improper purpose. *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990) (citing *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 832 (9th Cir. 1986), *abrogated on other grounds by Cooter & Gell*, 496 U.S. at 399–405).

## ANALYSIS

### A.    Motion to Compel Arbitration

"The cardinal precept of arbitration is that it is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *Ahlstrom*, 21 F.4th at 634 (internal quotations omitted). According to this cardinal precept, "courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010). Although the enforceability of an arbitration provision or its applicability to a particular dispute are issues that may be delegated to an arbitrator for resolution, the Ninth Circuit has clearly held that "parties cannot delegate issues of [contract] formation to the arbitrator." *Ahlstrom*, 21 F.4th at 635; *see also Teamsters*, 957 F.3d at 1042 ("[T]the federal policy favoring arbitration is no substitute for party agreement, or lack thereof."). Accordingly, courts "must determine whether a contract *ever* existed; unless that issue is decided in favor of the party seeking arbitration, there is no basis for submitting any question to an arbitrator." *Teamsters*, 957

1    F.3d at 1042 (quoting *Camping Const. Co. v. Dist. Council of Iron Workers*, 915 F.2d 1333, 1340

2    (9th Cir. 1990)).  "To determine whether the parties formed an agreement to arbitrate, courts

3    'apply ordinary state-law principles that govern the formation of contracts.'"  *Id.* (quoting *First*

4    *Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  "As the party alleging the

5    existence of a contract, [defendants] ha[ve] the burden to prove each element of a valid

6    contract—including mutual assent."  *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1086 (9th

7    Cir. 2020); *see also Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014)

8    (providing that, under California law, "the party seeking to compel arbitration, has the burden of

9    proving the existence of an agreement to arbitrate by a preponderance of the evidence").

10          To form a contract under California law,[2] the parties must manifest their mutual assent to

11   the terms of the agreement.  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir.

12   2022); *Donovan v. RRL Corp.*, 26 Cal. 4th 261, 270 (2001) ("An essential element of any contract

13   is the consent of the parties, or mutual assent.").  "'The existence of mutual consent is determined

14   by objective rather than subjective criteria, the test being what the outward manifestations of

15   consent would lead a reasonable person to believe.  Accordingly, the primary focus in

16   determining the existence of mutual consent is upon the acts of the parties involved.'"  *Monster*

17   *Energy Co. v. Schechter*, 7 Cal. 5th 781, 789 (2019) (citations omitted).  "These elemental

18   principles of contract formation apply with equal force to contracts formed online."  *Berman*, 30

19

20   [2]  Although defendants invoke Florida law under the assumption that their Terms of Use's choice
     of law provision applies, assuming as much would presuppose that a contract was formed, which
21   is the very issue now before this court.  *See Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240,
     1250 n.6 (N.D. Cal. 2019); (Doc. No. 14-1 at 11.)  "Where [as here] the underlying basis for
22   CAFA jurisdiction is diversity, the forum state's choice of law rules apply."  *Eiess*, 404 F. Supp.
     3d at 1249.  "In California, absent a controlling choice-of-law agreement, choice of law is
23   determined by a 'governmental interest' analysis."  *Id.* at 1249–50 (citing *Washington Mut. Bank,*
     *FA v. Superior Ct.*, 24 Cal. 4th 906, 915 (2001)).  The governmental interest analysis involves
24   three steps.  Under the first step, a court will apply California substantive law unless the party
     timely invoking another state's law "show[s] it materially differs from the law of California."
25   *Washington*, 24 Cal. 4th at 919.  Here, the first step in this analysis resolves the dispute because
     defendants do not meet their burden of identifying any material differences between California
26   law and Florida law.  Indeed, after assuming Florida law controls, defendants suggest Florida law
     is *not* materially different from California law by stating in a footnote that "California law would
27   yield the same result."  (Doc. No. 14-1 at 12 n.1.)  Thus, the court must apply California law.

28

F.4th at 855–56.  Thus, when "a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed."  *Id.* at 856.

The Ninth Circuit has explained that contracts formed over the Internet generally fall into two categories:  (1) "'clickwrap' (or 'click-through') agreements, in which website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use"; and (2) "'browsewrap' agreements, where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen."  *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014).  These two categories of Internet contracts fall on two ends of a spectrum; courts routinely find clickwrap agreements enforceable but are generally more reluctant to enforce browsewrap agreements.  *See Berman*, 30 F.4th at 856; *id.* at 868 (Baker, J., concurring).  Moreover, "[o]ften websites present some hybrid of the two, such as putting a link to the terms of the agreement on the page, sometimes near a button the user must click to continue."  *Berman v. Freedom Fin. Network, LLC*, No. 18-cv-01060-YGR, 2020 WL 5210912, at *2 (N.D. Cal. Sept. 1, 2020), *aff'd*, 30 F.4th 849 (9th Cir. 2022); *Berman*, 30 F.4th at 864–68 (Baker, J., concurring) (discussing differences between "browsewrap," "sign-in wrap," "clickwrap," and "scrollwrap" agreements).  To address this evolving spectrum, the Ninth Circuit has summarized the analytical framework for contract formation over the Internet as follows:

> Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if:  (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.

*Berman*, 30 F.4th at 856 (applying California law); *see also Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 461 (2021), *review denied* (Apr. 13, 2022).

Preliminarily, defendants here argue that issues "relating to the interpretation, applicability, enforceability or formation" of its Terms of Use have been delegated to an arbitrator and therefore the court should compel arbitration on that basis.  (Doc. No. 14-1 at 14) (citing *Mohamed v. Uber Technologies, Inc.*, 848 F.3d 1201, 1209 (9th Cir. 2016)).  Although

1   defendants' might be correct that the Terms of Use at issue in this case delegate decisions

2   regarding its interpretation, applicability, or enforceability to an arbitrator (*see* Doc. No. 14-5 at

3   6), the fundamental issue of whether a contract (which contained an arbitration provision) was

4   ever formed is for the court to determine.  *See Ahlstrom*, 21 F.4th at 635 ("We . . . hold that

5   parties cannot delegate issues of [contract] formation to the arbitrator."); *see also Eiess v. USAA*

6   *Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1248 (N.D. Cal. 2019) ("The fundamental threshold

7   question of whether there *exists* a binding contract (of which an arbitration clause is a part) cannot

8   be delegated because it cannot be assumed that a delegation clause contained therein must be

9   given effect.").  Accordingly, the court will now address whether a contract between defendants

10  and plaintiff (of which an arbitration provision is a part) was formed.

11          In regard to contract formation, defendants assert two arguments:  (i) under Florida law,[3]

12  and based on the allegations of plaintiff's original complaint that she read and relied on

13  representations regarding Thermofight from the It Works! website, plaintiff would have had

14  actual notice or inquiry notice of the Terms of Use located at the bottom of each It Works!

15  webpage and therefore is bound by the Terms of Use (Doc. No. 14-1 at 11–12); and (ii) plaintiff

16  agreed to the Terms of Use in making her purchase of Thermofight because she checked a box

17  and provided an electronic acknowledgment stating that she agreed to "all terms and conditions."

18  (Doc. Nos. 14-1 at 7–8, 12 n.8; 19 at 3–4.)  Regarding this latter argument, plaintiff contends in

19  her opposition that the webpage that she purportedly provided her electronic assent to does not

20  include the "Terms of Use" but instead is limited solely to the "Loyal Customer Agreement."

21  (Doc. No. 18 at 5–7.)

22          Having reviewed the relevant case law and considered the parties' arguments, the court

23  concludes that defendants have not satisfied their burden of proving that a contract containing an

24  arbitration provision was ever formed with plaintiff because defendants have not shown that

25  /////

---

26  [3]  Defendants invoke Florida law because the Terms of Use have a choice of law provision stating
27  that "all disputes, will be governed by the laws of the United States and by the laws of the State of
    Florida, without regard to principles of conflicts of law."  (Doc. No. 14-5 at 7.)  As previously
28  discussed above, however, the court must apply California law in this case.

1   plaintiff had actual notice of the Terms of Use nor satisfied the two prongs of an inquiry notice

2   theory of contract formation.[4]  *See Berman*, 30 F.4th at 856.

3          As an initial matter, defendants fail to carry their burden of showing that plaintiff had

4   actual notice of their Terms of Use.  Defendants' argument in that regard is based on plaintiff's

5   allegations in her FAC that she read and relied on product representations on the It Works!

6   website.[5]  (Doc. No. 14-1 at 7.)  But the reading of representations about a product does not

7   equate to a showing that plaintiff had actual notice of the Terms of Use, especially in light of

8   plaintiff's declaration stating she "never viewed the document titled 'It Works Website Terms of

9   Use'" and "never saw the link to [d]efendants' 'Terms of Use'" when she purchased Thermofight.

10  (Doc. No. 18-1 at ¶¶ 2–3.)  Thus, defendants have not shown that plaintiff had actual notice of the

11  Terms of Use and can only proceed on an inquiry or constructive notice theory of contract

12  formation.  *See Berman*, 30 F.4th at 856; *see also Sellers*, 73 Cal. App. 5th at 461 (holding that, in

13  the context of Internet consumer contracts, "in the absence of actual notice, a manifestation of

14  assent may be inferred from the consumer's actions on the website . . . which occurs only when

15  the website puts the consumer on constructive notice of the contractual terms").

16         To establish that plaintiff had inquiry notice of the Terms of Use, defendants must first

17  show that the It Works! website "provides reasonably conspicuous notice of the terms to which

18  the consumer will be bound."  *Berman*, 30 F.4th at 856.  Defendants have also failed to make this

19  required showing.  Here, the textual notice for the Terms of Use is not "displayed in a font size

20  and format such that the court can fairly assume that a reasonably prudent Internet user would

21

22  ⁴  For purposes of the court's analysis and to avoid the parties' dispute over plaintiff's declaration,
    the court will assume without deciding that plaintiff visited the It Works! website on a desktop

23  computer (as opposed to a mobile device) and assented to the Loyal Customer Agreement by
    clicking a box and providing an electronic acknowledgment.  Although the court is assuming as

24  much, the court does point out that defendants did not provide a copy of the Loyal Customer
    Agreement to the court or a declaration affirming that their records reflected plaintiff executing a

25  transaction on the It Works! website.

26
    ⁵  Specifically, defendants assert that "[o]ne of the terms that Plaintiff read on the It Works

27  website was that as a condition of using the website, Plaintiff agreed to the Terms of Use . . . ."
    (Doc. No. 14-1 at 7.)  Contrary to defendants' argument, however, this assertion is not supported

28  by the portions of the FAC that defendants cite to in their pending motion papers.

have seen it." *Id.*  Rather, the Terms of Use are only made available through a tiny grey

hyperlink displayed against a slightly lighter grey background and located in the very bottom left

corner of each webpage.  (*See* Doc. No. 18-2 at 65–66) (appended to this order as Appendix A).

The text of that hyperlink is so small that it is barely visible to the naked eye, and coupled with its

muted grey color and background, it is considerably deemphasized in relation to the other text on

the webpage.  (*See id.*)  No "[c]ustomary design elements denoting the existence of a hyperlink,"

such as "contrasting font color" or "the use of all capital letters," were used to make the Terms of

Use hyperlink more noticeable.  *Berman*, 30 F.4th at 857.  As the Ninth Circuit has explained,

"[w]ebsite users are entitled to assume that important provisions—such as those that disclose the

existence of proposed contractual terms—will be prominently displayed, not buried in fine print."

*Id.*  Plaintiff "cannot be expected to ferret out hyperlinks to terms and conditions to which [she]

ha[s] no reason to suspect [she] will be bound."  *Nguyen*, 763 F.3d at 1179; *see also Sellers*, 73

Cal. App. 5th at 481.  Rather, "the onus must be on website owners to put users on notice of the

terms to which they wish to bind consumers."  *Nguyen*, 763 F.3d at 1179.  The Terms of Use

hyperlink here falls woefully short of meeting this standard.

Next, even assuming defendants had provided conspicuous notice (which they did not),

they must also show that plaintiff unambiguously manifested her assent to be bound by the Terms

of Use.  *Berman*, 30 F.4th at 857.  At bottom, it is defendants contention that by their placing of

the hyperlink to the Terms of Use on the same webpage as the checkbox and electronic

acknowledgement for the Loyal Customer Agreement, which plaintiff clicked and agreed to,

plaintiff supposedly assented to both contracts.[6]

---

[6]  Defendant's argument implies that the contract is a hybrid between a clickwrap and a
browsewrap.  However, a review of the Terms of Use suggests that it is more akin to a pure
browsewrap agreement because it provides that, "[b]y accessing, browsing, or using the It Works!
website . . . you agree to be bound by this Agreement."  (Doc. No. 14-5 at 2.)  Indeed, "in a pure-
form browsewrap agreement, 'the website will contain a notice that—by merely using the
services of, obtaining information from, or initiating applications within the website—the user is
agreeing to and is bound by the site's terms of service."  *Nguyen*, 763 F.3d at 1176.  When faced
with pure browsewrap agreements, "[w]here the link to a website's terms of use is buried at the
bottom of the page or tucked away in obscure corners of the website where users are unlikely to
see it, courts have refused to enforce the browsewrap agreement."  *Id.* at 1177.  Notwithstanding
this observation, the court will accept defendant's hybrid argument for purposes of its analysis.

Defendants' argument in this regard is unpersuasive for several reasons. Primarily, the Terms of Use hyperlink is not near the checkbox, the electronic acknowledgment, or the scroll box containing the Loyal Customer Agreement, nor is a consumer required to view the Terms of Use before completing a purchase. (*See* Appendix A.) In short, there is no indication that when one is assenting to the Loyal Customer Agreement, one is also assenting to a separate contract, i.e., the Terms of Use. The disconnect between the Terms of Use hyperlink at the bottom of the webpage and the Loyal Customer Agreement is evident when viewing the website checkout screen displayed in Appendix A. Specifically, the Loyal Customer Agreement is titled "Terms & Conditions"; the checkbox immediately below the scroll box containing the terms of the Loyal Customer Agreement states, "I AGREE TO ALL TERMS & CONDITIONS"; and the additional paragraph of text below the checkbox but above the electronic signature states, in part, "I electronically acknowledge reading and understanding the *above* Terms & Conditions[.]" (Doc. No. 14-6 at 2) (emphasis added). Nothing at this point of the webpage suggests that these "Terms & Conditions" include or encompass the Terms of Use. To the contrary, the arrangement of the webpage and repeated use of the phrase "Terms & Conditions" implies that "ALL TERMS & CONDITIONS" is referring to the Loyal Customer Agreement located immediately above it (also titled "TERMS & CONDITIONS"), and not to the "Terms of Use" hyperlink found far *below* the electronic acknowledgement in the bottom left corner of the webpage among several other hyperlinks.

Finally, courts have found that small hyperlinks to website terms of use that are close in proximity to relevant buttons that consumers must click to continue using a website—far closer in proximity than the It Works! webpage shown here in Appendix A—are not reasonably conspicuous so as to put a reasonably prudent website user on notice. *See, e.g.*, *Berman*, 30 F.4th at 856–57, 859–61 (finding small grey underlined font stating "I understand and agree to the Terms & Conditions which includes mandatory arbitration" adjacent to where a website user would enter their zip code and click "This is Correct, Continue!" was insufficiently conspicuous to trigger inquiry notice to the consumer); *Sellers*, 73 Cal. App. 5th at 480–81 (finding the phrase "By clicking 'Start my trial' you indicate that you agree to the Terms of Service" insufficiently

1    conspicuous even when it was near a large orange button titled "Start my trial," because the text

2    was not in all capital letters, lacked contrasting font color, and was smaller than all other text on

3    the webpage); *Nguyen*, 763 F.3d at 1177–79 (concluding that "the placement of the 'Terms of

4    Use' hyperlink in the bottom left-hand corner of every page on the Barnes & Noble website" and

5    "either directly below the relevant button a user must click on to proceed in the checkout process

6    or just a few inches away" was "not enough to give rise to constructive notice").

7         For all of these reasons, the court concludes that defendants have failed to show that a

8    valid contract containing an arbitration provision was formed between plaintiff and defendants.

9    Likewise, defendants have not made an adequate showing that the It Works! website provides

10   reasonably conspicuous notice of the Terms of Use or that plaintiff took some action that

11   unambiguously manifested her assent to the Terms of Use.  Therefore, defendants' motion to

12   compel arbitration will be denied.

13   **B.     Motion for Sanctions**

14        Defendants also move for the imposition of sanctions on the grounds that plaintiff's

15   original complaint and FAC fail to comply with Rules 11(b)(1), (2), and (3) of the Federal Rules

16   of Civil Procedure.  (Doc. No. 34 at 11.)  The principal argument advanced by defendants in this

17   regard is that in the declaration plaintiff filed in opposition to their motion to compel arbitration,

18   plaintiff declared under oath "that she never visited the [It Works!] website" and that this

19   assertion allegedly contradicts allegations made by plaintiff in both her original complaint and the

20   FAC.  (*Id.* at 6, 16.)  Indeed, defendants contend that the core factual premise in the case is that

21   plaintiff "was supposedly misled by advertising and terms on the It Works! website" and

22   plaintiff's declaration "reveals" that this fundamental allegation "is undisputedly false."  (*Id.* at

23   6.)  As of the date of the pending motion for sanctions, defendants contend that they have

24   incurred $283,857.77 in reasonable attorney's fees and costs responding to this action, and that

25   plaintiff and her counsel should be required to pay those expenses caused by their alleged Rule 11

26   violations.  (*Id.* at 7, 19.)

27        "[I]t is well-established that an amended pleading supersedes the original pleading and

28   renders it of no legal effect."  *Williams v. County of Alameda*, 26 F. Supp. 3d 925, 936 (N.D. Cal.

1    2014).  Here, the FAC is the operative pleading in this action because it was filed within 21 days

2    after defendants filed their motion to compel arbitration, which is a timely amendment under Rule

3    15.  *See Ortega v. Spearmint Rhino Companies Worldwide, Inc.*, No. 17-cv-206-JGB-KK, 2017

4    WL 11272598, at *1 (C.D. Cal. June 12, 2017) (accepting that plaintiff's FAC filed within 21

5    days after defendant filed a motion to compel arbitration was timely because the motion to

6    compel arbitration counted as a "responsive pleading" under Rule 15).  Thus, defendants repeated

7    references to the inoperative original complaint (*see, e.g.*, Doc. No. 34 at 6) will be disregarded

8    by the court.  *See also Sneller v. City of Bainbridge Island*, 606 F.3d 636, 639 (9th Cir. 2010)

9    (noting that the filing of an amended complaint removing alleged Rule 11 violations cures those

10   alleged defects).

11          Although plaintiff has not had an opportunity to file an opposition to the pending motion

12   for sanctions, the court finds that it is able to address defendants' core argument without the aid

13   of plaintiff's input and will do so for the sake of judicial efficiency.[7]

14          The court concludes that defendants have failed to establish that the claims brought

15   against them are so legally or factually baseless as to be sanctionable at this early stage of these

16   proceedings.  *See In re Keegan*, 78 F.3d at 437 ("Rule 11 is an extraordinary remedy, one to be

17   exercised with extreme caution.").  The supposedly offending paragraph in plaintiff's declaration

18   states that, "[i]n making my initial Thermofight purchase, I did not view Defendants' website at

19   all."  (Doc. No. 18-1 at ¶ 4.)  This statement is not so definitive as to be a representation that

20   plaintiff never visited the It Works! website; it only precludes plaintiff from having visited the

21   website "in making her initial Thermofight purchase."  In this respect, the operative FAC can be

22   _____

23   [7]  Although "the focus of Rule 11 is on whether a claim is wholly without merit, and is not
     dictated by whether resources will be expended in deciding the motion, Rule 11 motions should

24   conserve rather than misuse judicial resources."  *Moeck v. Pleasant Valley Sch. Dist.*, 844 F.3d
     387, 392 n.9 (3d Cir. 2016).  In fact, "Rule 11(c)(6) requires only that a district court explain the

25   basis of its order when the court imposes a sanction, not when it denies sanctions."  *Id.* at 391
     (upholding denial of motions for sanctions where the district court merely found that the "motions

26   were meritless"); *accord* Fed. R. Civ. P. 11, Advisory Committee Note (1993) ("[T]he court
     should not ordinarily have to explain its denial of a motion for sanctions."); *Winterrowd v. Am.*

27   *Gen. Annuity Ins. Co.*, 556 F.3d 815, 826 (9th Cir. 2009) ("A district court does not as a matter of
     law abuse its discretion by summarily denying a request for sanctions without making specific

28   findings of facts.").

easily be squared with plaintiff's declaration because the FAC alleges that, "Plaintiff Aileen
Brooks purchased Thermofight from *an independent distributor using the It Works website* on
May 11, 2020."  (Doc. No. 17 at ¶ 77) (emphasis added); *see also* (Doc. No. 18-1 at ¶ 5 ("I made
my Thermofight purchase through an It Works 'independent distributor'. . . .").)  Thus, although
plaintiff herself may not have visited the It Works! website to make her initial purchase because
an independent distributor did so, that does not necessarily mean she could not have visited the
website on some other occasion.  Moreover, in reviewing the remaining contradictions alleged by
defendants between plaintiff's declaration and the allegations of her FAC, which were
documented in defendants' motion for sanctions (Doc. No. 34 at 9), it is not evident from a side-
by-side comparison that there is a clear contradiction warranting the extraordinary remedy of the
imposition of sanctions.  For example, although plaintiff alleges she "read and relied on, for her
Thermofight purchase, the product's packaging and the misrepresentations made by It Works on
Defendants' website," it is not clear whether plaintiff read those representations some time before
actually executing her initial purchase, in conjunction with a later purchase, or whether plaintiff
had the alleged misrepresentations parroted to her through the alleged independent distributor,
even though those same alleged misrepresentations exist independently on the It Works! website.

Lastly, given the early stage of this proceeding, it is difficult to assess whether plaintiff's
allegations regarding the It Works! website are so legally and factually baseless to warrant issuing
over a quarter million dollars in requested sanctions.  *See Foster v. Keeping*, No. 8:14-cv-0004-
AGD-FM, 2015 WL 12805149, at *2 (C.D. Cal. Feb. 23, 2015) (finding it "inappropriate to
address the legal and factual basis of [plaintiff's] claims for the first time in a motion for
sanctions" and declining to consider sanctions at an "early stage of the proceedings").  The court
is particularly reluctant to do so when the strongest evidence in support of issuing sanctions is a
quite equivocal single sentence of plaintiff's declaration.  *See Operating Engineers Pension Tr.*,
859 F.2d at 1344 ("[W]e reserve sanctions for the rare and exceptional case where the action is
*clearly* frivolous.") (emphasis added).  Accordingly, the court will deny defendants' motion for
the imposition of sanctions without prejudice.

/////

16

1    The court, however, cautions plaintiff and her counsel to heed the dictates of Rule 11.

2  The court will not turn a blind eye to claims brought baselessly if it later comes to light that such

3  allegations were facially untenable given the evidence available when the allegations were

4  asserted in the first instance.

5    Lastly, as defendants' point out in their pending motion for sanctions, this district court is

6  likely "the most overworked court system in the Ninth Circuit." (Doc. No. 34 at 7.) The parties

7  are forewarned that unnecessary motion practice severely hinders an already overburdened

8  district court. Before filing any further motions in this action, the parties are to exhaustively meet

9  and confer to resolve as many issues as possible. In the court's view, both parties are certainly

10  capable of doing a better job in this respect than they have done so far.

11                                **CONCLUSION**

12    For the reasons set forth above:

13    1.    Defendants' motion to compel arbitration (Doc. No. 14) is denied;

14    2.    Plaintiff's *ex parte* motion for leave to file a sur-reply in opposition to defendants'

15          motion to compel arbitration (Doc. No. 20) is denied;

16    3.    Defendants' motion for sanctions (Doc. Nos. 32, 34) is denied;

17    4.    Plaintiff's *ex parte* motion to strike defendants' Rule 11 motion, or in the

18          alternative, continue the motion and require that defendants' produce billing

19          records (Doc. No. 35) is denied as having been rendered moot by this order; and

20    5.    Plaintiff should not file any opposition to defendants' motion for sanctions (Doc.

21          Nos. 32, 34) pursuant to the court's prior minute order (Doc. No. 36).

22  IT IS SO ORDERED.

23    Dated:  **June 9, 2022**          _____

24                                UNITED STATES DISTRICT JUDGE

25

26

27

28

17

# APPENDIX A